IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JERZY WIRTH, | § | |
| | § | No. 11, 2026 |
| Plaintiff Below, | § | |
| Appellant, | § | Court Below—Court of |
| | § | Chancery of the State of |
| v. | § | Delaware |
| | § | |
| BLAKE J. EDWARDS and BEAU A. | § | C.A. No. 2024-0144 |
| EDWARDS, | § | |
| | § | |
| Defendants Below, | § | |
| Appellees. | § | |

Submitted: June 19, 2026
Decided: July 30, 2026

Before **SEITZ**, Chief Justice; **LEGROW** and **GRIFFITHS**, Justices.

## <u>ORDER</u>

After consideration of the opening brief and the record on appeal, it appears to the Court:

(1)     This case involves a dispute over property located at 1303 Chalet Drive (the "property") in Wilmington. Brian and Joan Edwards owned the property until Joan died in 2015.[1] After Brian died in 2020, the property passed to his heirs: one-

---

[1] The factual background is drawn from the Court of Chancery's post-trial rulings and the documents in the record. Citations to "Docket No. __" refer to items on the Court of Chancery docket. In pursuit of clarity, we refer to the members of the Edwards family by their first names. No familiarity or disrespect is intended.

third each to the defendants Blake Edwards and Beau Edwards, and one-sixth each to Brian and Joan's two minor grandchildren.[2]

(2)    As of November 2023, the property was at risk of foreclosure and scheduled to be sold at a sheriff's sale. There were two outstanding mortgages: one through Rocket Mortgage, with a balance of approximately $117,000 plus interest and other fees, and one through Citizens Bank, with a balance of approximately $50,000 plus interest and other fees. Plaintiff Jerzy Wirth left a flier at the property offering to assist the owners with avoiding the sheriff's sale and prospective eviction from the premises. Blake and Beau contacted and later met with Wirth, who presented them with a document memorializing the terms of an agreement to purchase the property in exchange for satisfying the mortgages.

(3)    On November 8, 2023, each of the defendants signed the document (the "First Agreement") on his own behalf; Blake also signed as "guardian" for the minor children.[3] The First Agreement stated that a sheriff's sale of the property was scheduled for November 14, 2023 and provided that, to stay the sale and "satisfy all the debts and liens on the Property," the parties had agreed that Wirth, defined as the "Buyer," "shall promptly exercise his due diligence with the creditors of the

---

[2] The defendants' brother Brad predeceased Brian, so a one-third interest passed in equal shares to Brad's two minor children.

[3] Under an order of the Delaware Family Court, Blake was the children's legal guardian, with the duties set forth in 13 *Del. C.* § 2340. After Wirth filed this action, the Court of Chancery appointed an attorney ad litem to represent the children in the litigation.

2

Property, and if successful in reaching agreements with the said creditors, and thus staying the said Sheriff Sale, the Buyer shall pay the Owners [Blake, Beau, and the minor children] a total of $10,000 in a manner specified in a separate 'Sale Contract for 1303 Chalet Drive.'" Wirth agreed to "satisfy all debts attached to the Property in a manner determined solely by [Wirth], and stay the said Sheriff Sale." The document contained a handwritten note stating that the $10,000 payment would "be increased to $15,000 in the event Citizens Bank satisfies the existing mortgage debt for an amount less than face value of debt." The First Agreement further provided: "In exchange, the Owners agree to convey the Property, in as is condition, to the Buyer, or his assigns, in a manner, and on a date, to be determined solely by the Buyer. The Owners agree to sign all of the required documents, as determined solely by the Buyer, and/or required by law, to consummate the said conveyance, in a timely and legal manner as determined solely by the Buyer . . . ." It required the defendants to vacate the property on or before January 1, 2024, and permitted Wirth to lease the property for one dollar per month, beginning January 1, 2024.

(4)     On November 12, 2023, Wirth and the defendants signed a second document titled "Sales Contract for 1303 Chalet Drive" (the "Sales Contract").[4] In the Sales Contract, the Edwardses agreed to sell the property to Wirth in exchange for Wirth's satisfaction of "both existing mortgages" and "all other liens on the

---

[4] Blake again signed as guardian for the minor children.

3

property dated November 12, 2023 or earlier," plus a total of $10,000 to be paid to Blake, Beau, and the children according to their percentage ownership interests. The Sales Contract stated that Wirth had wired $161,370.22 to Rocket Mortgage on November 10, 2023, and had paid Blake and Beau $2,500 each on an unspecified date. It provided that Wirth would pay the balance of the $10,000 when the property was vacated on or before January 2, 2024,[5] and would complete his other obligations before settlement. The Edwardses agreed to lease the property to Wirth or his assigns, "for 1 year or less, solely at the Buyers determination, for a payment of $1.00 per month, beginning the day after the Sellers vacate the Property." Wirth would be responsible for "all costs relating to the Property" after the family vacated. Settlement would take place "within 14 days after termination of the lease, or sooner at the sole determination of the Buyer."

(5)     After the parties signed the First Agreement and the Sales Contract, Wirth listed the property for sale online for $350,000 and placed a "for sale" sign in the yard. He later obtained mortgage satisfactions from Rocket Mortgage and Citizens Bank, dated November 15, 2023, and January 23, 2024, respectively.

(6)     In early January 2024, Wirth demanded that the defendants vacate the property. They refused. Wirth then filed suit against Blake, Beau, and the children in the Court of Chancery, seeking specific performance of the two agreements and

---

[5] The agreement states this date as January 2, 2023, but that appears to be a typographical error.

ejectment.[6] The court appointed an attorney ad litem for the children. The children filed an answer and counterclaims—and an opposition, in which Blake and Beau joined, to Wirth's motion for judgment on the pleadings—asserting that the contracts contained vague, indefinite, inconsistent, and contradictory terms; were invalid, unenforceable, and unconscionable; and that there remained disputed facts concerning the mortgages on the property.

(7) While Wirth's motion for judgment on the pleadings was pending, the court approved a settlement of the claims against the children. Under the settlement, Wirth acquired the children's one-third interest in the property in exchange for a cash payment. The court later denied the motion for judgment on the pleadings, finding that there remained material issues of disputed fact, including whether Wirth exerted undue pressure on the defendants and whether he had performed all his obligations under the agreements. The claims against Blake and Beau proceeded to trial.

(8) In an oral ruling at the conclusion of trial, the Court of Chancery determined that the contracts were unenforceable because they were unconscionable and held that Wirth was not entitled to specific performance. The court explained:

> Specific performance is an extraordinary remedy not to be awarded lightly, granted only to a party who proves by clear and

---

[6] Wirth initially was represented by counsel in the litigation. He later decided to proceed *pro se*, and counsel withdrew in October 2024.

5

convincing evidence that he is entitled to specific performance and that he has no adequate remedy at law.

To prove entitlement to specific performance, a party must establish by clear and convincing evidence that, one, a valid enforceable agreement exists between the parties; two, the party seeking specific performance is ready, willing, and able to perform under the terms of the agreement; and three, a balancing of the equities favors an order of specific performance. The decision as to the availability of specific performance rests within the sound discretion of this Court.

. . . .

"The doctrine of unconscionability stands as a limited exception to the law's broad support for freedom of contract." That is a quote from *James v. National Financial, LLC*, 132 A.3d 799[, 812 (Del. Ch. 2016)].

"When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract." That quote comes from *Libeau v. Fox*, 880 A.2d 1049[, 1056 (Del. Ch. 2005)]. Unconscionability is a concept that is used sparingly. A finding of unconscionability generally requires the taking of an unfair advantage by one party over the other. "A court must find that the party with superior bargaining power used it to take unfair advantage of his weaker counterpart." That is a quote from *Graham v. State Farm Mutual Automobile Insurance Company*, 565 A.2d 908[, 912 (Del. 1989)].

For a contract clause to be unconscionable, its terms must be so one-sided as to be oppressive. I refer the parties and future readers of this transcript ruling to Chancellor Allen's excellent opinion in *Ryan v. Weiner*, 610 A.2d 1377[, 1383 (Del. Ch. 1992)], for a deep explanation of Delaware law on unconscionability and citation to a number of real property cases "in which courts have set aside or refused to enforce conveyances because of the unfairness of price and other circumstances of inequitable or oppressive conduct."

In addition, in *Fritz v. Nationwide Mutual Insurance Company*, 1990 WL 186448[, at *4-5 (Del. Ch. 1990)], this Court identified ten factors to guide the unconscionability analysis.

Those factors include[:] "(1) The use of printed form or boilerplate contracts drawn skillfully by the party in the strongest

6

economic position, which establish industry wide standards offered on a take it or leave it basis to the party in a weaker economic position . . . ; (2) a significant cost-price disparity or excessive price; (3) a denial of basic rights and remedies to a buyer of consumer goods . . . ; (4) the inclusion of penalty clauses; (5) the circumstances surrounding the execution of the contract, including its commercial setting, its purpose and actual effect . . . ; (6) the hiding of clauses which are disadvantageous to one party in a mass of fine print trivia or in places which are inconspicuous to the party signing the contract . . . ; (7) phrasing clauses and language that is incomprehensible to a layman or that divert his attention from the problems raised by them or the rights given up through them; (8) an overall imbalance in the obligations and rights imposed by the bargain; (9) exploitation of the underprivileged, unsophisticated, uneducated and the illiterate . . . ; and (10) inequality of bargaining or economic power."

The second, eighth, ninth, and tenth factors of that test support a finding in this case that the November 8th and 12th agreements are unconscionable and therefore unenforceable. In my view, the parties' agreements reflect a shocking cost-price disparity or excessive price. Under the agreements, Wirth agreed to pay the defendants just $10,000 to avoid foreclosure of a property that appears to have had well over $100,000 in equity.

Although, in theory, the defendants avoided a potential deficiency judgment in a foreclosure proceeding, when I consider the amounts due on the mortgage and then the price at which Wirth listed the property shortly after the parties signed the agreement, the benefit of avoiding a remote deficiency judgment is shockingly small compared to the likely benefit to Wirth of immediately capitalizing on the more than $100,000 in equity in the property.

The overall imbalance in the obligations and rights under the agreements also supports a finding of unconscionability, as the agreements permitted Wirth to dictate the timing of closing and appear to impose no timing obligation for Wirth to satisfy the mortgages.

And then, importantly, the inequality of bargaining or economic power between the parties here supports a finding of unconscionability. While Wirth testified to having an understanding of foreclosure proceedings, purports to have expertise in finance, and claimed to advise the defendants on their potential options in the foreclosure, the defendants, by contrast, have no such familiarity with the foreclosure process.

7

Under these facts and taking into account the several hours of testimony I heard today, I conclude, as Chancellor Allen did in *Ryan v. Weiner*, "that this represents that unusual case in which a court of equity cannot let stand an executed contract but is obligated to grant the remedy of rescission."[7]

(9) The court also stated that "even if the contracts were enforceable . . ., under the facts of this case, I would not exercise my discretion to employ equity to specifically enforce the terms of the agreements."[8] But the court did not leave Wirth without a remedy. The court declared the contracts invalid and determined that the parties should be returned to the positions they were in before entering the contracts. To achieve that result, the court determined that Blake and Beau would be ordered to repay Wirth the amounts he paid them and the amounts that he paid the mortgage companies to satisfy the mortgages. Because Wirth had not presented evidence at trial proving all the amounts he paid, however, the court permitted Wirth to supplement the record with evidence of those amounts within thirty days, after which it would enter an implementing order imposing an equitable lien on the property in Wirth's favor.

(10) At Wirth's request, the court held an evidentiary hearing on October 16, 2025, to "address the terms and amount of the equitable lien."[9] Following that

---

[7] Docket No. 109 (Order Imposing Equitable Lien), at 3-5 (recounting earlier bench ruling; some alterations in original) [hereinafter October 22 Order]; Docket No. 107 (Trial Transcript with Rulings of the Court), at 179-84 (Del. Ch. June 13, 2025) [hereinafter Trial Transcript].

[8] Trial Transcript, *supra* note 7, at 184.

[9] Wirth did not order a transcript of the October 16 hearing.

8

hearing, the court found that Wirth had demonstrated that he made a total of $169,046 in payments under the agreements, which included $161,370.22 to Rocket Mortgage on November 10, 2023; $5,000 to the defendants on November 12, 2023; and $2,675.78 in taxes and other fees on September 23, 2024.[10] The court found the evidence insufficient to determine the amount Wirth paid in satisfaction of the Citizens Bank mortgage, but again permitted him to supplement the record.[11] The court rejected Wirth's request for an award of interest on the amounts paid. The court imposed an equitable lien on the property for $112,697.33, "reflect[ing] two-thirds of the amounts that Plaintiff paid under the Agreements, representing the remaining Defendants' proportionate share of gains under the Agreements."[12] The court reasoned that Wirth "is not entitled to the gains that the Minor Defendants received under the Agreements because the [settlement] extinguished Plaintiff's claims against the Minor Defendants."[13]

(11) After Wirth submitted additional information, the court found that Wirth had paid $72,130.90 to Citizens Bank to satisfy its mortgage on the property. The court entered an order modifying the amount of the equitable lien to $160,784.60, again constituting two-thirds of the total amount that Wirth had paid.[14]

---

[10] October 22 Order, *supra* note 7, at 6-7.
[11] *Id.* at 7 n.1.
[12] *Id.* at 7 n.2.
[13] *Id.* (citing *In re Mindbody, Inc. S'holder Litig.*, 332 A.3d 349, 407-08 (Del. 2024)).
[14] Docket No. 113 (Order Modifying Equitable Lien).

(12)   On December 8, 2025, the court entered a letter order addressing Wirth's motion for reargument and clarification. The court clarified that one-half of the equitable lien would be satisfied from Blake's one-third interest in the property, and one-half of the equitable lien would be satisfied from Beau's one-third interest in the property. The court rejected Wirth's argument that the court should not have reduced the amount of the equitable lien to account for the one-third interest in the property that was addressed by the settlement.

(13)   Wirth then filed another motion seeking clarification that the equitable lien "constitutes a final, fixed monetary charge against the undivided ownership interests of the two remaining Defendants" and leave to transfer and docket the equitable lien in the Superior Court for purposes of execution. The court denied the motion, holding that the equitable lien is not a judgment on which Wirth can execute in Superior Court but "will remain as a lien against the Property until the amount of the lien is repaid and a satisfaction is filed in the chain of title for the Property."[15] The court further stated: "If the Property is sold (including in a partition sale), the amount of the Equitable Lien must be repaid to Plaintiff from Blake J. Edwards' and Beau A. Edwards' respective one-third interests in the sale proceeds."[16]

(14)   Wirth asserts five arguments on appeal. We address each in turn.

---

[15] Docket No. 123 (Jan. 7, 2026 Letter Order).
[16] *Id.*

10

(15)　First, Wirth argues that the Court of Chancery erred by finding that the agreements were unconscionable. Specifically, he contends that the court erroneously failed to apply the "two-prong unconscionability analysis"[17] articulated in *Tulowitzki v. Atlantic Richfield Co.*[18] and to identify a specific term of the contract that was unconscionable. We disagree. The court carefully reviewed the well-established standards governing the doctrine of unconscionability and applied them to the facts found from the evidence presented at trial. It found that there was a "shocking cost-price disparity" because Wirth "agreed to pay the defendants just $10,000 to avoid foreclosure of a property that appears to have had well over $100,000 in equity." It also found an overall imbalance in the parties' rights and obligations under the agreements and significant inequality in their knowledge of

---

[17] Opening Brief at 10.

[18] 396 A.2d 956 (Del. 1978). Wirth's characterization of *Tulowitzki* as establishing a "two-prong unconscionability analysis" oversimplifies the applicable law. In *Tulowitzki*, the Court wrote that, to find a contract term unconscionable,

> there must be an absence of meaningful choice and contract terms unreasonably favorable to one of the parties. Superior bargaining power alone without the element of unreasonableness does not permit a finding of unconscionability or unfairness. The traditional test is this: a contract is unconscionable if it is such as no man in his senses and not under delusion would make on the one hand, and as no honest or fair man would accept, on the other. It is generally held that the unconscionability test involves the question of whether the provision amounts to the taking of an unfair advantage by one party over the other.

*Id.* at 960 (citations and internal quotations omitted). The Court of Chancery's decisions in *James v. Nat'l Fin., LLC*, 132 A.3d 799 (Del. Ch. 2016), *Ryan v. Weiner*, 610 A.2d 1377 (Del. Ch. 1992), and others on which the Court of Chancery relied in this case further expound on the doctrine.

11

the foreclosure process and their bargaining and economic power. Whether framed as a finding that the agreement was unconscionable or as a determination that the balance of equities did not tip in Wirth's favor,[19] the court did not abuse its discretion by declining to award specific performance.[20] Moreover, although Wirth challenges the court's determination that the property was worth $350,000, he had the burden of proving his claim by clear and convincing evidence.[21] In that context, the court's reliance on the only evidence of value presented at trial—the fact that Wirth listed the property for sale for $350,000—in concluding that the contract was unconscionable and that Wirth did not prove his claim for specific performance does not constitute reversible error.

(16) Second, Wirth contends that the court erroneously imposed the equitable lien for only two-thirds of the total amount that he paid. He claims that the

---

[19] As discussed above, the court correctly observed that a party seeking specific performance must establish, among other things, that the balance of equities tips in his favor and concluded that "even if the contracts were enforceable . . ., under the facts of this case, I would not exercise my discretion to employ equity to specifically enforce the terms of the agreements." *See supra* at 6, 8; *see also Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010) ("Specific performance for the transfer of real property is an extraordinary remedy and we will not award it lightly. A party must prove by clear and convincing evidence that he or she is entitled to specific performance and that he or she has no adequate legal remedy. A party seeking specific performance must establish that (1) a valid contract exists, (2) he is ready, willing, and able to perform, and (3) that the balance of equities tips in favor of the party seeking performance." (citations omitted)).

[20] *See Peden v. Gray*, 2005 WL 2622746, at *3 (Del. 2005) ("This Court reviews a trial court's grant or denial of specific performance for abuse of discretion, because specific performance is a matter of grace that rests in the sound discretion of the court. . . . The party seeking specific performance has the burden of proving entitlement by clear and convincing evidence." (internal quotations and citations omitted)).

[21] *Osborn*, 991 A.2d at 1158; *Peden*, 2005 WL 2622746, at *3.

settlement with the children was not intended to reduce his claims against the adult defendants and that the reduction confers a windfall on Blake and Beau at his expense. We disagree. Blake and Beau own two-thirds of the property and therefore received two-thirds of the benefit from the amounts that Wirth paid. They have not received a windfall.[22] Moreover, Wirth ignores that he acquired a one-third interest in the property through the settlement and thus holds one-third of the property—corresponding to the children's entire former interest—in addition to the equitable lien representing the adult defendants' proportionate share of the amounts Wirth paid.

(17)   Third, Wirth asserts that the court erred by declining to transfer or docket the equitable lien in the Superior Court, leaving him without a practical means of recovery. He does not cite any authority to support the conclusion that the Court of Chancery was required to—or even could—transfer the equitable lien for enforcement in Superior Court. In its January 7, 2026 letter decision, the Court of Chancery determined that the equitable lien "is not a judgment on which Plaintiff can execute in Superior Court; rather, it will remain as a lien against the Property

---

[22] The Court of Chancery explained that Wirth "is not entitled to the gains that the Minor Defendants received under the Agreements because the [settlement] extinguished [Wirth's] claims against the Minor Defendants." October 22 Order, *supra* note 7, at 7 n.2. The court analogized to the principle that, under the Delaware Uniform Contribution Among Tortfeasors Act, "a release of some joint tortfeasors . . . reduces the claim against the remaining tortfeasors." *In re Mindbody, Inc. S'holder Litig.*, 332 A.3d 349, 407-08 (Del. 2024). Though not directly applicable in this context, the analogy is apt.

until the amount of the lien is repaid and a satisfaction is filed in the chain of title for the Property."[23] The court further explained that if the property is sold—including in a partition sale—the amount of the equitable lien must be repaid to Wirth from Blake and Beau's respective one-third interests in the sale proceeds.[24] Wirth therefore is not left without meaningful relief, and we find no reversible error as to this issue.

(18) Fourth, Wirth challenges the court's decision not to award interest. He asserts that the court should have awarded either interest or rent to compensate him for the time value of the money that he paid while the defendants remained in possession of the property. We conclude that the Court of Chancery appropriately exercised its discretion in matters of equity in denying his request for interest.[25] As to rent, the issue is not sufficiently presented or preserved to enable appellate review.[26]

---

[23] Docket No. 123 (Jan. 7, 2026 Letter Order), at 2.

[24] *Id.* at 2-3. A partition proceeding can also address claims for contributions for expenses paid by one co-tenant for another co-tenant's benefit. *See generally Green v. Shockley*, 2022 WL 275975 (Del. Ch. Jan. 31, 2022) (Magistrate Report) (considering claims for contributions and offsets in partition proceeding), *exceptions denied*, 2022 WL 4589217 (Del. Ch. Sept. 30, 2022).

[25] *See* October 22 Order, *supra* note 7, at 7-9.

[26] For example, Wirth complained in some of his filings in the Court of Chancery that he now owned one-third of the property and the defendants and others were continuing to occupy the property without paying rent. But it is not clear from the record before the court whether Wirth specifically presented any claim for, or evidence as to, rent. As noted above, Wirth did not order preparation of the transcript of the October 16, 2025 hearing concerning the amount of the equitable lien, after which the Court of Chancery denied Wirth's request for interest.

14

(19) Finally, Wirth argues that the court abused its discretion by refusing to consider evidence of the property's value that Wirth proffered after trial, when the court "did not request valuation evidence during trial."[27] It is the litigant, not the court, that has the burden of presenting evidence in support of his claims. In the interest of fairness, the court specifically permitted Wirth—twice—to supplement the record with evidence of the amounts he paid to satisfy the mortgages. It did not hold the record open for any other purpose. The court used the only evidence of value that was presented at trial—that Wirth listed the property for sale for $350,000—in reaching its unconscionability conclusion. The court did not abuse its discretion by declining to consider unauthenticated documents that Wirth filed post-trial as evidence of the property's value.[28]

NOW, THEREFORE, IT IS ORDERED that the judgment of the Court of Chancery is AFFIRMED.

BY THE COURT:

*/s/ N. Christopher Griffiths*
Justice

---

[27] Opening Brief at 16.
[28] Docket No. 117 (Letter Opinion Resolving Motion for Reargument and Clarification).